T.C. Memo. 1997-247

UNITED STATES TAX COURT

MORGAN L. LUCID AND MARY J. LUCID, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22933-95.                          Filed June 2, 1997.

<u>Harry J. Kaplan</u>, for petitioners.

<u>Steven Walker</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined income tax
deficiencies for 1990 and 1991 in the amounts of $20,334 and
$49,727, respectively.  Respondent also determined accuracy-
related penalties under section 6662(a)[1] of $4,067 and $9,945 for

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable years in
                                              (continued...)

1990 and 1991, respectively.  The issues for our consideration are:  (1) Whether, in 1990 and 1991, petitioners were engaged in an activity for profit pursuant to section 183(a); and (2) whether petitioners are liable for accuracy-related penalties under section 6662(a) for the 1990 and 1991 taxable years.

## FINDINGS OF FACT[2]

Petitioners resided in Fresno, California, at the time the petition in this case was filed.  Morgan L. Lucid (petitioner husband) was a full-time plastic surgeon, and Mary J. Lucid (petitioner wife) was a full-time psychotherapist licensed in California until her retirement on June 30, 1986.

Petitioner husband is an experienced sailor and served in the Navy during World War II.  Petitioner husband has had navigation experience with a sextant and the Geographical Positioning System.  He has taken courses in navigation, metal welding, and meteorology.  Petitioner husband has also made engine, radar, and radio repairs, and was a certified scuba diver and licensed ham radio operator.  Petitioner wife is an experienced sailor and has taken courses in meteorology, coastal navigation, ham radio, and first aid.  Petitioner wife has also

---

[1](...continued)
issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties' stipulation of facts and exhibits is incorporated by this reference.

lectured on subjects including cruising at sea, provisioning, watch scheduling, cooking at sea, rescue equipment and its use, safety at sea, and stowing a yacht.

Petitioners have always experienced personal pleasure from yachting. For approximately 14 years, they owned a 34-foot family yacht called Credence, which they used solely for personal purposes. Their travels on Credence included trans-Atlantic, trans-Pacific, east coast, west coast, and Caribbean offshore cruises. In 1976, petitioner husband skippered Credence to Hawaii and back, employing celestial navigation for the 45-day trip. From September 1979 to March 1980, petitioners took time off from their respective professions to sail Credence from San Francisco to Florida via the Panama Canal. In 1981 and 1982, petitioners took the summer months off to sail the Chesapeake Bay and the coast of Maine. In 1983, petitioners sailed Credence, with their son and niece, to the Azores, Ireland, and England, utilizing only a sextant and a radio directional finder. Overall, petitioners cruised at least 20,000 miles on Credence. During 1984, petitioners sold Credence.

In early 1985, petitioners began using stationery printed with the letterhead "Lucid Cruising, Offshore Outfitters and Advisors". Subsequently, they met with an accountant and an attorney to discuss the formation of a corporate entity to sell yachts and boating equipment under the name "Lucid Cruising".

Neither the attorney nor the accountant was experienced in selling yachts. During March 1987, petitioners formed, in order to protect themselves from liability, a subchapter C corporation called "Lucid Cruising, Inc." It was a wholly owned subsidiary of Dr. Lucid's medical corporation, Morgan L. Lucid, M.D. Inc., which was incorporated on September 5, 1974. During October 1988, Lucid Cruising, Inc., was merged into its parent, Morgan L. Lucid, M.D., Inc.; eventually, the merged corporation was renamed "Morgan L. Lucid, Inc. Lucid Cruising" (Lucid Cruising), and S corporation status was elected. Petitioners were the sole shareholders of Lucid Cruising.

On December 30, 1985, petitioners indicated an interest in pursuing a contract to be the sole west coast representative of Kanter Yachts Corp. (Kanter Yachts). Petitioners believed that steel and aluminum yachts afforded much more protection than wooden or fiberglass yachts.

In 1986, petitioners became interested in acquiring a metal-hulled sailboat. After examining and sailing in Lake Superior a particular type of yacht, an Atlantic 45-foot owned by a Mr. Donaldson, petitioners decided to lengthen the hull by 5 percent. With the help of the architect who designed Mr. Donaldson's yacht, petitioners made other changes to the vessel's design. On June 6, 1986, petitioners requested that Kanter Yachts build a yacht based on the detailed plans drawn by the architect.

In a June 6, 1986, letter to Kanter Yachts, petitioners inquired as follows:

> Would you agree to list us as West Coast representatives of your line, this being a month to month agreement in which either party could cancel with thirty days notice and in which our commission would be protected to any potential buyer we had written to you about for ninety days.  We would agree to show the boat at "In the Water Shows" here on the West Coast.

On June 23, 1986, Kanter Yachts replied that it would agree to make the extensive changes required by petitioners.  The letter also contained the statement:

> We also thank you for your offer to represent us on the West Coast and we would be pleased to offer a 5% finder's fee for any future contacts resulting in a sale.

If petitioners had made successful referrals, they would have made approximately $15,000 Canadian per referral.

In September 1986, petitioners and Kanter Yachts signed a contract to build, for $296,894.11 Canadian,[3] an Atlantic 47-foot steel-hulled sailboat named "Brendan" based on petitioners' architect's design.  During construction, Kanter Yachts suggested lengthening the yacht by 1 foot, and Lucid Cruising agreed.

On October 9, 1986, petitioners informed Kanter Yachts:

> We * * * appreciate that as your West Coast representatives you will provide us with fliers and assist us with our first boat shows on the East Coast. You have an excellent product and we find it easy to be

---

[3] The parties stipulated the amount shown in this opinion; however, the contract reflects $283,430 Canadian.  The Court has chosen to follow the parties' stipulated amount.

enthused.  For our part, we will plan on showing the boat in Stamford [Connecticut] and Annapolis [Maryland] in late summer and early fall of 1987.  We would appreciate any help you can provide in improving our skills of showing a boat, obtaining space at the shows, etc.

On December 30, 1986, petitioner husband noted that a contract with Kanter Yachts had been signed on August 21, 1986. The notes further stated:

The officers of Lucid Cruising met with the Kanters on August 9th and came to an agreement that Lucid Cruising would be the representative of Kanter Yachts on the West coast.  Mr. Kanter promised that he would be on hand for the first show on the West Coast.  He will pay for the registration at this show.  In turn this company will receive 5 % of the cost of every yacht sold as a result of our showing the yacht.  The 5 % will cover both the cost of the yacht and the extra equipment on it.

Beginning in 1987, petitioners were becoming dissatisfied with Kanter Yacht's handling of the contract to build Brendan. In February 1987, Kanter Yachts was behind schedule in constructing Brendan, and petitioners visited Kanter Yacht's Canadian factory during February, April, June, and July 1987 in order to verify the quality of workmanship and to ensure that the yacht was being built according to the specifications.  Each factory visit was followed by a letter by petitioners, summarizing the results of their visit and providing specifications on how they wanted the Brendan to be built. During that time, relations between petitioners and the owner of Kanter Yachts deteriorated to the point that the parties were not speaking to each other.

The July 31, 1987, Lucid Cruising corporate minutes mentioned the "decided strained feelings" with Kanter Yachts, and that: "[Petitioners'] * * * dependence upon having a good seaworthy yacht that is attractive to show is most important in making this corporation solvent." Petitioners decided to begin an advertising campaign for the upcoming Seattle boat show because Kanter Yachts would be responsible for the advertising and registration for the Annapolis boat show.

In September 1987, petitioners took possession of the Brendan in Canada but damaged it the next day while sailing. The vessel was returned to Kanter Yachts for repairs. Petitioners' insurance policy covered the damage to the sailboat. The insurance contract was entitled, "The Travelers Personal Yacht Policy" from The Travelers Insurance Companies. The policy read, in part:

> Private Pleasure Use Only
>
> We do not provide any coverage under this policy while the insured yacht is used for charter, hire, or any other commercial purpose, unless approved by us in writing.

The Brendan was returned to petitioners in January 1988. It was shipped overland from Port Stanley, Ontario, Canada, to Seattle, Washington. The sailboat was damaged by the trucking company in transit. The damage was repaired, and petitioners showed the Brendan at the Seattle boat show from January 16, 1988 through February 28, 1988. Petitioners distributed their business cards and brochures that were supplied by Kanter Yachts. Approximately

33 people signed the visitors' book.  The February 28, 1988, Lucid Cruising corporate minutes contained the statement that petitioners reminded Kanter Yachts that, if someone purchased a yacht after viewing Brendan, they expected a 5-percent fee.

For the next 12 months, petitioners spent time equipping Brendan for their projected cruise to New Zealand, which was scheduled for May 1989.  However, petitioners discovered problems with Brendan and requested that Kanter Yachts rectify the situation.  In June 1988, petitioners took a cruise for a week to the San Juan Islands in Washington State.

On July 12, 1988, petitioner wife, as a representative of Lucid Cruising, wrote to Kanter Yachts regarding the planned arrival of Brendan in Redwood City, California.  The letter states:

> It is Morgan's hope that BRENDAN will be the yacht that
> he has planned and looked forward to having.  He
> believes that after the leaks have been repaired, the
> decks primed and recalked and epoxy that was spilled
> next to the bulwarks cleaned he will forget the
> problems that have plagued Brendan since her delivery
> in Seattle and truly begin to enjoy her.

Additionally, petitioner wife stated that she was interested in having the boat "returned to original value" and taking all steps to protect their investment.

Sometime in July 1988, petitioners sailed Brendan for 5 days from Washington State to Redwood City, California, where petitioners docked Brendan.  Until January 1989, Brendan was permanently docked in Redwood City.  This location was approximately 50 minutes from petitioners' residence.

The July 31, 1988, Lucid Cruising corporate minutes contain a statement that petitioners, as the corporate officers, were concerned over the problems with Brendan.  Petitioners believed that they "have not really had the opportunity to show [the Brendan] * * * and realize some profit for the corporation."

On August 31, 1988, petitioners wrote a letter to a magazine that had covered the boat show and clarified that Brendan was not for charter.  The letter contains the statement that petitioners "are representing Kanter [Y]achts on the West Coast and believe that steel and aluminum yachts are the wave of the future for the safety factor".  In August 1988, petitioners informed Kanter Yachts that they had confidence that the shipyard would be able to effect the repairs to Brendan, and "look[ed] forward to enjoying BRENDAN for years to come."

In September 1988, petitioners demonstrated Brendan at a boat show in Alameda, California.  Petitioners maintained a visitors log for those who viewed the yacht, and over 300 people signed it.  At that time, petitioners distributed fliers advertising Kanter Yachts, as well as their own business cards.  Prior to the show, petitioners advertised the showing of the Brendan in two boating magazines.

The total time petitioners spent cruising on Brendan from 1987 through 1989 was as follows:  (1) A 5-day cruise from Seattle, Washington, to the San Juan Islands in Washington State in 1988; (2) a 5-day cruise from Washington State to Coyote Point in Redwood City, California, in 1988; (3) a day cruise from

Coyote Point down the coast to the South San Francisco area in 1988; (4) a day cruise from Coyote Point to display the yacht at the Alameda Boat show in the fall of 1988; and (5) a day cruise from Coyote Point to San Francisco Boat Yard for repairs.

During January 1989, petitioners came to believe that Brendan was dangerous and unseaworthy due to improper welding by Kanter Yachts during construction. In February 1989, petitioners demanded that Kanter Yachts purchase Brendan. However, Kanter Yachts offered, instead, to repair the sailboat. On February 27, 1989, in corporate minutes subsequent to a meeting with the representatives of Kanter Yachts, it was recorded: "Mrs. Lucid explained that both her husband and she could not consider making ocean passages in the yacht."

On March 9, 1989, petitioners also wrote to Kanter Yachts:

We have studied your proposal #2 very carefully. We do not enjoy the prospect of being without a boat for six months, especially during the summer sailing season; nor the trips at each stage of construction. However, if we can reach an agreement I assure you that we will do our utmost to assure a cordial working relationship. The main or core problem is in the welding and as I have learned aluminum is a very difficult metal to work with.

    *    *    *    *    *    *    *

* * * [The proposed agreement] assumes that Lucid Cruising Inc. continues to represent Kanter Yacht Corporation on the west coast. * * *

On April 1, 1989, to resolve the dispute, Kanter Yachts made an agreement with Lucid Cruising, Inc. In the contract, Kanter Yachts agreed to build petitioners a new yacht, named "Trinity",

based on the same plans as <u>Brendan</u>.  The agreement stated in part:

> 6.  Upon completion of the new yacht Kanter at its expense (including payment of any custom charges and duty) shall transport it to San Francisco and commission the yacht in the water.  Sea trials if required by Lucid shall be paid for by Lucid.  Lucid shall transfer title of Brendan to Kanter and in exchange Kanter shall transfer title of the new yacht to Lucid.  * * *
>
> *       *       *       *       *       *       *
>
> 14.  It is understood that since Kanter has agreed to replace the hull of Brendan by constructing a new yacht, it is the intent that the new yacht's specifications and equipment in every case must meet but not exceed those for the yacht Brendan.  * * *

On July 19, 1989, petitioners informed Kanter Yachts that they were anxious to put the problems involving <u>Brendan</u> behind them.  Petitioners stated:

> We were at a Marine Medicine meeting last week at Univ. of Calif. Med school which was very good and raised our urgency about getting back on the water and cruising. Our winds have been delightful this summer and we miss not sailing.  There will be so many things that will need to be done befroe [sic] we can cast off our lines but we will continue to be patient.

By 1989, petitioners were no longer enthusiastic with respect to the professionalism or acumen of Kanter Yachts.  To ensure that Kanter Yachts did not build the new boat, <u>Trinity</u>, with the same flaws as <u>Brendan</u>, petitioners: (1) Hired an independent third party to inspect the new hull during construction as well as to inspect the factory; (2) flew from San Francisco to Canada on a monthly basis to personally inspect the ongoing construction of the new vessel; and (3) wrote

approximately 12 letters to Kanter Yachts, detailing how they wanted Trinity to be built. By October 1989, petitioners considered requesting their attorney to intervene in the dispute because they believed Kanter Yachts was unreceptive.

Petitioners anticipated receiving Trinity by October 1989, pursuant to the contract signed between them and Kanter Yachts. Petitioners were upset when Trinity was not completed in early 1990. In April 1990, petitioners canceled their registration to show Trinity at the boat show in Alameda, California.

Also during April 1990, Trinity was shipped overland via truck to petitioners. The sailboat was damaged in transit when it hit an underpass in Berkeley, California. The hull of the Trinity was seriously damaged. The ensuing repairs took approximately 6 weeks.

Upon receipt of the Trinity, petitioners ceased contact with Kanter Yachts. An adversarial relationship grew when petitioners believed that the Trinity had various flaws. For example, the keel bottom was not painted, there was no cover for the linear drive, the batteries were dead, the head intake leaked, the guard rail around the stern of the boat was unstable and needed reinforcement. Additionally, the exhaust pipe was not properly fitted, which caused waste water to spill into the boat.

Petitioners paid for the repairs in connection with the Trinity. In July 1990, the repairs on the Trinity were completed, and petitioners launched the vessel. Petitioners discovered that the propeller shaft-fitting leaked, and it had to

be repaired in dry dock.  They requested that Kanter Yachts pay

for the repairs, and on July 18, 1990, Kanter Yachts' attorney

refused to undertake the repairs or to reimburse petitioners for

the repair costs.  The attorney for Kanter Yachts advised

petitioners that:

> With respect to the list of items referred to in
> your letter, our client has carefully reviewed each
> item and has determined that due to the picayune nature
> of the items nothing further will be done.

In August 1990, petitioners wrote to their accountant, stating in

part:

> We are also thinking of about [sic] closing the company
> of Lucid Cruising since we feel at this time that in
> all honesty we cannot endorse or represent the Kanter
> Yacht, Inc., with the history that they have had with
> us the past 3½ years.  * * *

On November 20, 1990, petitioners' attorney wrote to Kanter

Yachts requesting $15,000 to settle their dispute.  Petitioners

did not receive a response to their proposal from the attorney

representing Kanter Yachts.

Ultimately, petitioners decided that the cost of prosecuting

a lawsuit against Kanter Yachts, a Canadian company, would be

prohibitive.  The dispute between petitioners and Kanter Yachts

was never resolved.

In July 1991, petitioners dissolved their corporation.

After the dissolution, petitioners modified _Trinity_ at a cost of

$11,000 so that they could solely manage the vessel at sea.  They

explained that they did not sell _Trinity_ because sailboat prices

were depressed and they would have received approximately one-half of their cost.

In October 1991, petitioner husband retired from the practice of plastic surgery and sold his business. In the same month, petitioners began a 5-year retirement cruise on <u>Trinity</u> to the South Pacific, including New Zealand and Australia. There was no business purpose for the cruise.

By 1991, Lucid Cruising had incurred $496,827 in yacht acquisition costs and operating expenses. Lucid Cruising also reported on its Federal income tax returns the following items:

| | 3/16/87 7/31/87 | 1987 1988 | 1988 | 1989 | 1990 1991 |
|---|---|---|---|---|---|
| Income | 0 | $942 | $500 | 0 | 0      0 |
| Expenses | $3,848 | $11,631 | $19,683 | $65,649 | $71,576   $10,819 |
| Net Loss | 3,848 | 10,689 | 19,183 | 65,649 | [1]71,576   10,819 |

[1] In the stipulation, this figure appears to contain a typographical error. The Court has chosen to follow the figure in the tax return.

Petitioners deducted substantially all the expenses related to the <u>Brendan</u> as a business expense of Lucid Cruising in 1987 and 1988, respectively. In 1990, petitioners deducted substantially all the expenses related to the <u>Trinity</u> as a business expense of Lucid Cruising. Petitioners used the loss from Lucid Cruising to offset their gross income from 1988 through 1991.

Petitioners' reported gross income without reference to losses from Lucid Cruising or other activities was as follows:

| Year | Gross Income |
|------|--------------|
| 1988 | $325,213 |
| 1989 | 346,593 |
| 1990 | [1]321,265 |
| 1991 | [1]229,757 |

[1] The parties' stipulation does not comport with the amounts reflected in the tax returns.  The Court has chosen to follow the figures in the returns.

Kanter Yachts primarily relied on advertising to sell yachts.  The company expended approximately $51,000 to $74,000 in advertising per year.  Kanter Yachts had not sold a boat in any of the 12 boat shows attended from 1987 through 1991.  Manfred Kanter (Kanter), proprietor of Kanter Yachts, did not believe that petitioners represented Kanter Yachts during 1990.

OPINION

We must first decide whether petitioners were involved in activities that were "not engaged in for profit" within the meaning of section 183(c).  Section 183(a), generally, provides that, if an activity engaged in by an individual is not engaged in for profit, no deduction attributable to such activity shall be allowed, except as provided in section 183(b).[4]  Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under

[4] In the case of an activity not engaged in for profit, sec. 183(b)(1) allows a deduction for expenses that are otherwise deductible without regard to whether the activity is engaged in for profit.  Sec. 182(b)(2) allows a deduction for expenses that would be deductible if such activity were engaged in for profit, but only to the extent the total gross income derived from the activity exceeds the deductions allowed by sec. 183(b)(1).

paragraph (1) or (2) of section 212." Section 162 allows a deduction for all ordinary and necessary expenses paid or incurred in carrying on a business. Section 212 allows a deduction for all the ordinary and necessary expenses paid or incurred for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

Whether deductions are allowable under sections 162 or 212 depends on whether the taxpayer engaged in the activity with the objective of making a profit. Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one; however, the taxpayer must have a bona fide objective to make a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Beck v. Commissioner, 85 T.C. 557, 569 (1985); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

Whether a taxpayer has the requisite profit objective is a question of fact to be resolved on the basis of all of the facts and circumstances of the particular case at hand. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner, supra at 720. The taxpayer here bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Greater weight is given to objective facts than a taxpayer's

statement of intent.  Independent Elec. Supply, Inc. v.
Commissioner, 781 F.2d 724 (9th Cir. 1986), affg. Lahr v.
Commissioner, T.C. Memo. 1984-472; Beck v. Commissioner, supra at
570; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792
F.2d 1256 (4th Cir. 1986); Dreicer v. Commissioner, supra.

Section 1.183-2(b), Income Tax Regs., provides a
nonexclusive list of factors relevant to the issue as to whether
the taxpayer has the requisite profit objective.  These factors
are:  (1) The manner in which the taxpayer carries on the
activity; (2) the expertise of the taxpayer or his advisers;
(3) the time and effort expended by the taxpayer in carrying on
the activity; (4) the expectation that the assets utilized by the
taxpayer may appreciate in value; (5) the success of the taxpayer
in carrying on other similar or dissimilar activities; (6) the
taxpayer's history of income or losses with respect to the
activity; (7) the amount of occasional profits, if any, which are
earned; (8) the financial status of the taxpayer; and (9) whether
elements of personal pleasure or recreation are involved.  Not
all of these factors are applicable in every case.  Brannen v.
Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C.
471 (1982); Taube v. Commissioner, 88 T.C. 464, 479-480 (1987);
Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Allen v.
Commissioner, supra at 34.  No one factor nor a majority of the
factors is necessarily determinative, and we do not reach our
conclusion by simply counting the factors that support each

party's position.  Taube v. Commissioner, supra at 480; Dunn v. Commissioner, supra at 720.

The Manner in Which the Taxpayer Carries On the Activity. Generally, the fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners advertised in various boating magazines and journals.  They attended two boat shows in Seattle, Washington, and Alameda, California, respectively, in 1988.  Petitioners, however, had no written business plan and did not take reasonable steps to implement their stated objectives.  Petitioners' principal contention is that they could not carry on their yacht-related activities because they lacked a demonstration boat to represent Kanter Yachts and display or sell boating equipment. We are not convinced that the lack of either Brendan or Trinity formed an insuperable barrier to selling boating equipment or yachts.

Petitioners failed to conduct even a basic investigation of the profitability of selling yachts and boating equipment before entering into the activity.  Their business plan assumed that they would earn income through the sales of yachts and boating equipment.  Petitioners' primary method of selling Kanter Yachts was through boat shows.  Petitioner husband testified that he was hoping to eventually sell three yachts per year.  However, despite the fact that Brendan was demonstrated in both the

Seattle and Alameda boat shows in 1988 and over 300 people signed the visitors' log, there were no sales.  Kanter testified that his company, Kanter Yachts, relies primarily on advertising to sell yachts, and that it had not sold a boat in any of the 12 boat shows they attended from 1987 through 1991.

Petitioners' stated intention to make a profit did not comport with the fact that Lucid Cruising had nearly half a million dollars of accumulated costs by 1991.  If petitioners had sold the three yachts projected, per year, for a commission of $15,000 Canadian on each yacht, it would have taken nearly 11 years of consistent sales merely to recover their costs already incurred.[5]

Other than the self-serving statements in the corporate minutes, there is nothing in the record showing that petitioners were authorized dealers or representatives of boating and/or boating equipment manufacturers.  The record does not reflect any sales of boating equipment that would have ameliorated the length of time necessary to break even.

Petitioners' marketing and advertising activities were minimal.  Although petitioners advertised in various magazines, they did not promote their activities between September 1988 through July 1991.  Petitioners ceased their selling activity

---

[5] Five hundred thousand dollars of capitalization divided by $15,000 commission per yacht multiplied by three yachts per year equals nearly 11 years.  Although the parity between U.S. and Canadian currency varied during this period, we provide these figures for illustrative purposes only.

several weeks after the Alameda Boat show in September 1988. That was when <u>Brendan</u> began experiencing problems which sidelined petitioners' plans. Moreover, petitioners could not recall their advertising budget. In comparison, Kanter Yachts' annual advertising budget ranged from $51,000 to $74,000. In 1990 and 1991, petitioners did not pursue any of the 300 visitors to their yacht from the Seattle and the Alameda boat shows.

Finally, the record demonstrates that petitioners did not objectively treat <u>Brendan</u> or <u>Trinity</u> as business assets. Petitioners used the yachts for personal sailing. In this regard, <u>Brendan</u> was not commercially insured. After the dissolution of petitioners' corporation, Lucid Cruising, they retained <u>Trinity</u> and used it for extensive personal sailing.

<u>The Expertise of the Taxpayer or His Advisers.</u> Petitioners were experienced sailors, and petitioner husband had experience maintaining yachts. However, petitioners had no experience with selling yachts or sailboat equipment.

<u>Time and Effort Expended by the Taxpayer in Carrying On the Activity.</u> Petitioners spent minimal time carrying out the activity in 1990 and 1991. The fact that a taxpayer devotes little time to the activity may indicate a lack of profit motive. Sec. 1.183-2(b)(3), Income Tax Regs. Here, petitioners did not actively promote or advocate their yacht-related activity between September 1988 through 1991. Also, petitioner husband worked full-time as a plastic surgeon until his retirement in October

1991.  Around the same time, petitioners chose to terminate the activity.

Petitioners spent several months in 1990 and 1991 addressing issues with Kanter Yachts.  We find that petitioners were genuinely motivated by the desire to maintain their investment in the yachts.  On the other hand, we think that the minimal amount of time petitioners spent in this activity does not support their contention that they were engaged in this activity with a profit objective in 1990 or 1991.

Expectations That Assets Used in the Activity May Appreciate in Value.  Petitioners did not present any evidence that the yachts used in their activity would appreciate in value or that the yachts were obtained for such purposes.  In fact, petitioners testified that the market for yachts was depressed in 1991.  Petitioners assert that this was the reason they did not dispose of Trinity after their corporation, Lucid Cruising, was dissolved in 1991.

The Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities.  Petitioners have not presented any evidence that they had been previously engaged in activities consisting of selling yacht equipment or yachts themselves.  Sec. 1.183-2(b)(5), Income Tax Regs.  Petitioners, however, were financially successful in their business professions.

The Taxpayer's History of Income and Losses With Respect to the Activity. Petitioners' yacht-related activity generated losses over a period of 5 years, which petitioners used to offset taxable income from other sources. A record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's intention regarding the activity. Cannon v. Commissioner, 949 F.2d 345, 352 (10th Cir. 1991), affg. T.C. Memo. 1990-148; Golanty v. Commissioner, 72 T.C. at 426-427. The presence of such losses in the formative years of a business is not inconsistent with an intent to achieve a later profitable level of operation; however, the goal must be to realize a profit on the entire operation, which presupposes sufficient future net earnings from the activity to recoup the losses. Golanty v. Commissioner, supra at 427.

In the present case, petitioners reported operating losses over 5 years totaling $496,827. Petitioners contend that the losses were attributable to unforeseen circumstances that were beyond petitioners' control. Sec. 1.183-2(b)(6), Income Tax Regs. Generally, losses sustained because of unforeseen circumstances beyond the control of the taxpayer do not necessarily indicate that the activity was not engaged in for profit. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979); sec. 1.183-2(b)(6), Income Tax Regs. However, the overall picture reveals that petitioners did not operate an activity for profit during the taxable years at issue, 1990 and 1991. They made no

attempts to change their operating methods to become profitable. They did not advertise or pursue potential customers. Petitioners took no measures to reduce their expenditures for unprofitable activities.

The Financial Status of the Taxpayer. When petitioners purchased Brendan and Trinity, they were receiving significant professional income. Petitioners earned gross income of: (1) $325,213 in 1988; (2) $346,593 in 1989; (3) $321,265 in 1990, and (4) $229,757 in 1991. Petitioner husband's income as a plastic surgeon allowed petitioners to maintain the activity, and upon his retirement, petitioners dissolved their S corporation, Lucid Cruising, and terminated their activity. At that point, there was no need to shelter petitioners' income by means of the yacht activities' claimed losses.

The Presence of Elements of Personal Pleasure or Recreation. Although there were many self-serving business-type statements in Lucid Cruising's corporate minutes, it is readily apparent that petitioners were highly motivated by the pleasure and recreation from these activities. They were seasoned recreational sailors for at least 14 years, prior to acquiring Trinity. Both Brendan and Trinity were custom-built according to specifications for petitioners. Petitioners have not shown that business was the primary purpose for acquiring the yachts.

We accordingly hold that petitioners have failed to prove that they were engaged in the activity of selling boating

equipment and yachts during 1990 and 1991 with the bona fide objective of making a profit.

Respondent also determined accuracy-related penalties under section 6662(a) for 1990 and 1991. Section 6662(a) provides for a penalty of 20 percent of any portion of the underpayment attributable to the taxpayer's negligence or disregard of the rules or regulations. Sec. 6662(a).

Petitioners contend that they are not liable for the penalty because they had substantial authority for their deductions. They argue, generally, that the weight of the authorities supports their position that their yacht activity was carried on for profit. Specifically, petitioners rely on Pryor v. Commissioner, T.C. Memo. 1991-109. In Pryor, we found that the taxpayer was engaged in his sailboat charter activity with a profit motive in part because he carried on the activity in a business like manner. He made a written 12-year projection that was essentially a cash-flow analysis before entering into the activity. He also anticipated appreciation in the residual value of his sailboats. However, a portion of the taxpayer's losses were attributable to unanticipated expenses of repairs to his sailboats.

In contrast, petitioners here possessed no written business plan. Their expectations of a profit from their activity were based more on their own self-serving and unrealistic expectations. They did not consult with others in yacht and boating equipment sales. Petitioners did not attempt to assuage

their losses by changing their approach. Hence, <u>Pryor v. Commissioner</u>, <u>supra</u>, is distinguishable.

Petitioners also rely on <u>Dickson v. Commissioner</u>, T.C. Memo. 1983-723, in which we found that despite losses, due to economic conditions, the taxpayer was engaged in the business of chartering his boat with a profit motive. We also found that the taxpayer actually and honestly expected his boat to appreciate. However, this case is inapposite; petitioners did not purchase and hold <u>Brendan</u> or <u>Trinity</u> in order to derive gains from long-term appreciation. There is also nothing on the record from which we can conclude that the value of the yachts would have increased.

Petitioners also cite <u>Jackson v. Commissioner</u>, 59 T.C. 312 (1972). In <u>Jackson</u>, we determined that the taxpayer was in the trade or business of renting his yacht. Despite bad weather and damage to the yacht, which forced the taxpayer to cancel most charters, he took other steps to carry on his activity for profit. For example, the taxpayer changed the venue of his activity to the Virgin Islands, where his sailing vessel was in demand. The taxpayer also began a national advertising campaign. In that regard, he engaged a celebrity to advertise his business throughout the nation. We find petitioners' reliance on <u>Jackson</u> to be distinguishable. Here, petitioners did not take alternate steps to carry on their yacht-related activity in a profit-oriented manner. Petitioners' cessation of their activity

between 1988 and 1991 militates against the notion that petitioners sought to derive profit from that activity.

These cases do not represent authority for petitioners' position. Accordingly, respondent's determination regarding the accuracy-related penalty is sustained.

<u>Decision will be entered for</u>

<u>respondent.</u>